## Case No. 18,046.

### WORKS v. JUNCTION RAILROAD.

[McLean, 425;[1] 10 West. Law J. 370.]

Circuit Court, D. Ohio. April, 1853.

INJUNCTION—PUBLIC NUISANCE— OBSTRUCTION OF NAVIGATION — DRAW-BRIDGE OVER NAVIGABLE WATER—CONSENT OF SOVEREIGN POWER—CHARTER OF RAILROAD—LINES AUTHORIZED.

1. A citizen of another state owning property in this state, has a right to come into the circuit court of the United States, asking for an injunction to restrain the acts of a corporation, incorporated under the laws of Ohio, which, if consummated, would do irreparable injury to his property situated here.

2. A private person cannot apply to a court of chancery to prevent or remove a public nuisance, which does him no special injury. But he may, if the nuisance is immediately injurious to himself, although it may also affect the public. A private person owning a tannery, flour mill, saw mill, stores and warehouses, a wharf and water lots, and stock in a plank road leading from the town where they are situated, which is upon a river navigable for steamboats, schooners, and other vessels, and from which trade is carried on with other ports, in which he participates, may injoin a railroad company from obstructing the navigation of the bay into which that river empties, when such obstruction will materially injure the trade of that town.

[Cited in People v. Detroit White Lead Works, 82 Mich. 478, 46 N. W. 737; Ballentine v. Webb, 84 Mich. 47, 47 N. W. 488.]

3. From the nature of such an injury, its extent cannot be ascertained with precision. It is permanent; consequently suits at law for relief must be endless. To establish a wrong of this nature, it need not be measured by dollars and cents. It must be shown to exist; it must be material; but the particular amount of damages can not and need not be shown. In such cases, adequate relief can be given only by injunction.

4. Where the termini of a railroad are fixed by its charter, and an amendment is made thereto authorizing the company "to extend its line of railroad to a point on a river" named, which is beyond the original terminus and not in a direct line with the termini, the company are not authorized in departing from one terminus named, and constructing a direct line between the other terminus and the point designated on the river, which will leave the original point of termination entirely out of the line of the road. The extension of a line does not authorize a departure from it in the middle or any other part of it, except from its terminus.

5. Where a railroad company was authorized by its charter "to construct branched roads from the main route, to other towns or places in the several counties through which the road might pass," they are limited to the construction of branch roads, which leave the main route and terminate at some town or place within the same county as that in which the other terminus of the branch is situated. The construction of a line of road, commencing in one county and terminating in another, is not authorized by such a provision.

6. A railroad company was authorized to construct a railroad, making S. and F. points in the main line. They proceeded to put under construction a line from S. to P., which lies thirty-eight degrees north of a direct line from S. to F., and which, if brought down to that line, would not be half way between S. and F.

7. The court considered that this was manifestly intended to be the main line, and could not be called a branch.

---

[1] [Reported by Hon. John McLean, Circuit Justice.]

8. A right to change a location, "either for the difficulty of construction, or of procuring a right of way at a reasonable cost, or whenever a better and cheaper route can be had," does not authorize a company to relocate, because a particular town, on the selected route, will not contribute to the road. Nor will it authorize a departure from the points named in the charter.

9. The right to cross a navigable water by a railroad bridge, must be given by the sovereign power, by a special or general act. Where this is not done, neither the board of public works, nor an acting commissioner of that board, can approve of the structure of a bridge over it. No such power is given by the twentieth section of the act of Ohio of May 1, 1852, to provide for the creation and regulation of incorporated companies. 3 Curwen's Rev. St. p. 1882.

10. By the twentieth section of that act (3 Curwen's Rev. St. 1882), either the acting commissioner of the board of public works, within whose territorial jurisdiction the work is to be erected, or the board of public works may approve of the plan or structure of a proposed bridge over a navigable water; and as the law has provided for no appeal from the decision of the acting commissioner, his favorable decision is final. A reversal of that decision by the board is a nullity, they having no jurisdiction over the subject.

11. The expression, "the acting commissioner having charge of the public works where such crossing is proposed," in the twentieth section of the act alluded to (3 Curwen's Rev. St. 1882), means nothing more than that such place shall be within the territorial jurisdiction of the commissioner. It does not mean that the water over which the bridge is proposed to be erected, should be a portion of the public works of Ohio. The words "navigable waters" are used in no such restricted sense; they embrace and were intended to embrace, all waters within the state, which are navigable by the works of art or nature.

12. Where a company is authorized to construct a railroad between two points, "over" a navigable water, a right to construct a bridge over that water is implied, as a necessary means of carrying into effect the power granted.

13. Under the power to regulate commerce, congress have power to prevent the obstruction of any navigable river, which is a means of commerce between any two or more states. The exercise of this great public right is not incompatible with the enjoyment of local rights. The public right consists in an unobstructed use of a navigable water connecting two or more states. The local right is to cross such water. The general commercial right is paramount to all state authority.

14. A public nuisance can not be tolerated on the ground that the community may realize some advantages from its existence. The doctrine on this subject, as it is stated in the Wheeling Bridge Case, 9 West. Law J. 535, adopted and followed.

[Cited in People v. Detroit White Lead Works, 82 Mich. 478, 46 N. W. 737; Ballentine v. Webb, 84 Mich. 47, 47 N. W. 488.]

15. A draw-bridge over navigable water, although it unavoidably occasions some delay in passing it, is not necessarily such an obstruction to the navigation as to amount to a nuisance. The delay is submitted to in consideration of the benefits conferred.

16. In considering whether a draw-bridge is an obstruction, the unskillfulness of the seamen, and the probability of men not being ready at the draw to open it, are to be laid out of consideration. The law presumes that what ought to be done will be done, and that since seamen should be skillful, they will be so.

17. When the chancellor is asked to restrain the erection of a bridge, on the ground that it will be an obstruction to the navigation, and the

testimony offered to prove it so, is so nearly balanced as not to incline the scale on either side, the extraordinary and preventive power of an injunction, which may be ruinous to one of the parties, ought not to be exercised.

In equity.

McLEAN, Circuit Justice. The complainant [Samuel Works], a citizen of New York, states that he owns a large amount of real estate at and near Fremont, on the Sandusky river, in the county of Sandusky, state of Ohio, which comprises a tannery, half of a flouring mill, saw mill, a store and warehouses, a wharf and water lots; that the Sandusky river from Fremont is navigable for steamboats, schooners and other vessels, and that a commerce is carried on from it, down the river and bay to different ports on the lakes; that he has plank-road stock which pays a profit by the transportation of produce to and from Fremont; and that shipments are made of flour and lumber from his mills, and leather from his tannery, etc. He represents that the defendants are about constructing a railroad from Sandusky City to Toledo, crossing the Sandusky Bay by a bridge on a line to Port Clinton, in Ottowa county; that the bridge, if made, will materially obstruct the commerce of the bay to his individual and irreparable injury, and he prays for an injunction to restrain the defendants from the construction of their proposed bridge.

The Junction Railroad Company answers that it is engaged in building a railroad between Cleveland and the Maumee river, connecting with Toledo, and extending from that city to the west line of the state, under various charters which authorize them to prosecute the work.

The Port Clinton Railroad Company demurs generally to the complainant's bill, and answers, denying the fraud and collusion with the Junction Railroad, as charged in the bill. It denies that it has any connection with the Junction Railroad, either to aid it or receive aid from it. The navigableness of the Sandusky Bay above the proposed bridge, and also of the Sandusky river to Fremont, is admitted by the parties and the pleadings. The general government has recognized this fact by making Fremont a port of entry, and the state of Ohio, by appropriating funds in removing certain obstructions in the Sandusky river.

Has the complainant a right to prosecute this suit? If the proposed bridge shall be an obstruction, as charged in the bill, it will be a public nuisance. No individual can complain of such a structure, unless his interests are injuriously affected by it. In such case it is a private nuisance to him, and if at common law he can obtain no adequate remedy, he may seek relief by injunction.

The complainant's citizenship gives him a right, in ordinary cases, to prosecute a suit in this court. But to maintain this suit, he must superadd a private injury which is

irremediable at common law. Has this been shown? I think it has. From the property owned by the complainant, from the different kinds of business in which he is engaged, it appears that any material obstruction to the commercial outlet from Fremont must injuriously affect his interests. The product of his mills, his wharf, his grounds on the river, are enhanced in value by an unobstructed commerce. His road stock is more or less affected by the transportation of freight to and from Fremont. The injury from the obstruction, if it be material, affects directly the articles shipped, and indirectly tends to lessen the value of the operating means through which these articles are produced or acquired. If such injury exist, no adequate remedy can be found by an action at law. From the nature of the injury, its extent can not be ascertained with precision. It is permanent; consequently the suits at law for redress must be endless. In such a case, adequate relief can be given only by injunction. It prevents the wrong. To establish this wrong, it need not be measured by dollars and cents. It must be shown to exist; it must be material; but the particular amount of damage can not and need not be shown. A mischief being proved, which can not be redressed at common law, connected with the citizenship of the plaintiff, establishes his right prima facie to prosecute this suit. The right to prosecute being shown or admitted, the nature and extent of the nuisance may be examined. The extent of the commerce obstructed may be proved, and also the dangers and probable losses to which it will be subjected.

The complainant having maintained his right to sue, the defendants are thrown upon their defense. This they have attempted to make, by giving in proof the act incorporating the Junction Railroad Company, with its various amendments, and also the incorporation of the Port Clinton Company.

The charter of the Junction Railroad Company was granted the 2d of March, 1846. The second section authorizes it to construct a railroad, "commencing at such point on the Cleveland, Columbus and Cincinnati Railroad as the directors may select, either in the county of Cuyahoga or Lorain, and within thirty miles from Cleveland; thence to Elyria, in Lorain county, unless the junction with the Cleveland and Columbus road should be made at Elyria; and from thence on the most feasible route to intersect the Mad River and Lake Erie Railroad at Bellevue, or at such other point as the directors shall choose, and thence to Lower Sandusky; and the said corporation shall have power to construct the said railroad or a branch of the same, from Elyria to Sandusky City, and from thence to Lower Sandusky." Under this provision the road has been constructed from Cleveland by Ohio City, Elyria, to Sandusky City, and is now being constructed thence nearly on a straight line to Port Clin-

ton, crossing the Sandusky Bay, and extending, on the shortest route to the Maumee. This route is alleged to be some eight or nine miles shorter than any other. By the amendatory act of the 2d of March, 1846, the Junction Railroad Company, was authorized to extend its line of railroad to some point on the Maumee river, with the privilege of transporting goods and passengers, transported on the road of said companies, across said river, by ferry or otherwise, as the directors thereof shall elect, to the city of Toledo; provided, the said company shall in no wise obstruct or hinder the navigation of said river. The sixteenth section of the original charter gave power to the corporation to locate and construct branched roads from the main line to other towns or places in the several counties through which said road may pass. And by the seventeenth section the company was authorized to commence, complete, and put in operation, any part of said road, or any branch thereof, aforesaid, at any point on the route of said railroad which the interest of the company may require to be first commenced and completed.

The point where the Junction Railroad was to commence on the Cleveland, Columbus and Cincinnati Railroad was left to the discretion of the directors, within the limitation of thirty miles from Cleveland. The road was commenced at Ohio City, near to Cleveland, and to the Columbus road, but not on it. Admitting this to be within a liberal construction of the charter, the road was extended by Elyria, Amherst, Vermilion and Huron to Sandusky City, connecting with the Mad River Railroad at that point. Instead of extending the road from Sandusky City to Fremont, the last point named in the original charter, a survey has been made to cross the bay a few miles above Sandusky City, on nearly a straight line to Port Clinton and the Maumee river. And this, it is contended, can not be done under the original charter or the first amendment. That amendment "authorized the company to extend its line of railroad to some point on the Maumee river." The extension of a line does not seem to authorize a departure from the line at the middle, or any other part of it, except from its terminus. Had the extension commenced from this point, no navigable water would have been crossed by the line of the road to the Maumee, except Sandusky river. That this was the direction the legislature intended to give the road, appears by the words used, and also by the provision that in crossing the Maumee its navigation should not be obstructed—there being no such provision for crossing the Sandusky Bay.

It is supposed that the branching power from the main road, as provided in the sixteenth section, and the authority given in the seventeenth section to make and complete any part of said road, or any branch thereof, as the company may direct, authorized the diversion of the road to Port Clinton, crossing the Sandusky Bay. The power to make branches is limited to towns or places, in the several counties through which the main road shall pass. Now, although the branches may be made before the main road, yet they must proceed from the line of the main road, and terminate at towns or places in the same county. The branch is an incident to the main road, and whether made before or after the construction of the main road, the termini of the branch is the same. By the direction given to the road from Sandusky City, it is clear it was not intended to run to Fremont, but to cross the bay in the direction to Port Clinton, leaving the direct route to Fremont several miles south. As an excuse for this departure, it is said in the answer that the people in Fremont, by subscriptions or otherwise, gave no encouragement to the company to run the road to that place; and that the route selected is better, and several miles shorter than the one by Fremont. Under such circumstances it is difficult to say that the road now in progress from Sandusky City to the Maumee, over the bay and by Port Clinton, is a branch of the original road within the charter. Neither its commencement nor termination is within the sixteenth section. It does not branch in the county of Ottowa, nor terminate at some town or place in that county. It is in fact the main road from Sandusky City to the Maumee, and was avowedly intended to be so, from the time the route was surveyed. The charter requires the company to organize in five years, and to complete twenty miles of the road in ten years from the time its structure was commenced; and under this provision it is said the company having made more than twenty miles of the road, may, at its own convenience, extend the road to Fremont from Sandusky City, and the road, if extended to the Maumee from Fremont, must pass through Ottowa county; and then the road now in course of construction may be considered as a branch or branches from it. It can not be within the purpose of the company to make the road to Fremont, and thence to the Maumee. No benefit could result to the company or the public from such an expenditure. There is now a road in progress from Fremont to Toledo, and also the Port Clinton road, running in the same direction. There is no admitted latitude of construction, it seems to me, which can bring the Port Clinton road within the charter of the Junction Railroad as amended. It would sanction a principle which would enable chartered companies to disregard the limits prescribed, and give such a direction to roads as their interests may dictate. By the tenth section, "if the corporation, after having selected a route for said railway, find any obstacle in continuing said location, either by the difficulty of construction or procuring the right of way at a reasonable cost, or whenever a better and cheaper route can be had,

it shall have authority to vary the route and change the location." This does not authorize the company to abandon and disregard the points named in the charter, but to change the route which they have selected, for the causes stated.

Upon the deliberate consideration which I have given to the Junction Railroad charter, I am brought to the conclusion that it does not authorize the route selected, and without authority it is presumed no one could contend for the right of crossing the Sandusky Bay. The amendment extending the road gives no such authority. The act of the 1st of May, 1852 (3 Curwen's Rev. St. 1877), provides, "that any number of natural persons, not less than five, may become a body corporate, with all the rights, privileges and powers conferred by, and subject to all the restrictions of that act." The second section declares, "that any number of persons as aforesaid, associating, to form a company for the purpose of constructing a railroad, shall, under their hands and seals, make a certificate which shall specify as follows: 1. The name assumed by such company, and by which it shall be known. 2. The name of the place of the termini of said road, and the county or counties through which such road shall pass. 3. The amount of capital stock necessary to construct such road. Such certificate being acknowledged before a justice of the peace, and certified by the clerk of the court of common pleas, and recorded by the secretary of state, shall confer corporate powers."

On the 6th of October, 1852, Ebenezer Lane and five others applied, under the above law, to be incorporated as the "Port Clinton Railroad Company," beginning the road at Sandusky City, and extending it by Port Clinton, over the Sandusky Bay, to Toledo; and all the requisites of the act having been complied with, they became a corporate body. This body, on the 11th of January, 1853, submitted to James B. Steadman, acting commissioner, the plan of a bridge for crossing the bay, which he approved, and which approval was notified to the company.

Two objections are made to this act of the commissioner: (1) That it was contrary to the decision of the board of public works. (2) That the acting commissioner had no jurisdiction of the matter. It appears that on the 8th of July, 1852, the Junction Railroad applied to the board of public works, "to obtain leave, if it be necessary, to construct a drawbridge across Sandusky Bay," which was refused by the board for want of jurisdiction. The decision of the board, on the application of the Junction Railroad for leave to cross the bay by a bridge, was a very different application from that decided by Steadman. He approved of the plan of the bridge; the right to cross the bay was not submitted to him. But on the 17th of February, 1850, the board of public works did reverse the decision of Steadman in relation to the Port Clinton

bridge. And I will now consider the effect of this reversal.

The twentieth section of the above act (3 Curwen's Rev. St. 1852) gives the power to the acting commissioner, the same as to the whole board. Either may approve of the plan or structure of a proposed bridge over a navigable water; consequently, they act independently of each other, and no provision having been made for an appeal to the board from the decision of the acting commissioner, his favorable decision is final. And this power to the acting commissioner being given by law, can not be controlled or reversed by the board. The procedure of the board, therefore, in the reversal of the approval by Steadman of the plan of the bridge presented by the Port Clinton Company, was void. It was an exercise of power which did not belong to the board. If the application had been made to the board by the Port Clinton Company, for the approval of the plan of their bridge, and the board had decided against it, having jurisdiction of the matter, the acting commissioner could not in form or in effect reverse the decision. But the application was, as above stated, by the Junction Railroad, "for leave to cross the bay," and this power did not belong to the board; it, therefore, very properly held that it had no jurisdiction. But it had jurisdiction, and so had the acting commissioner, to approve the plan of the bridge. An appeal, under the statute, from the decision of the board, by the Junction Railroad, would have been ineffectual, as the board was asked to do that which the law did not authorize it to do.

The right to cross a navigable water by a railroad bridge, must be given by the sovereign power, by a special or general act. Where this is not done, neither the board of public works, nor an acting commissioner, can approve of the structure of a bridge over it. For the reasons above stated, I have been brought to the conclusion, that the charter of the Junction Railroad, original and amended, does not authorize the company to construct a railroad bridge over Sandusky Bay at the place designated.

But the act of approval by the commissioner, on the application of the Port Clinton Company, is objected to, on the ground that the Sandusky Bay was not a public work, "under his direction," within the meaning of the statute. The words of the statute are, "Whenever the line of any railroad company now existing, or which may hereafter organize under this act, shall cross any canal, or any navigable water, the said company shall file with the board of public works, or with the acting commissioner thereof, having charge of the public works where such crossing is proposed, the plan of the bridge, and other fixtures for crossing such canal or navigable water, designating the place of crossing; and if the said board, or acting commissioner thereof, shall approve of such plan, he shall notify such

company, in writing, of such approval." A corporation, formed under this general law, is vested with all the ordinary powers to accomplish the purpose intended. It may appropriate private property, and do all other things necessary in the construction of a railroad. The general act is as specific in its details of the rights and duties of the company as can be found in special acts of incorporation. The legislature of Ohio has been cautious, as all other legislatures have been, in passing special acts for bridges and railroads, to guard against obstructions on navigable waters. And this twentieth section of the general law, was intended to preserve this great public right. The plan of a bridge over any navigable water must be approved by the board of public works, or by an acting commissioner. This duty was more appropriate to the general business of the members of that board, than to any other association under state organization. To limit the application of this provision to the crossing of canals, and waters made navigable by the state, would strangely disregard the policy of the act, and the necessities of the public. The language of the section does not authorize so narrow a construction. It was known, that in every part of the state, railroads would be projected which necessarily cross navigable waters. Special provision is made for the crossing of canals. Our best rivers are navigable by nature; and on the theory stated, no provision is made in the act for crossing them. They are navigable waters, and are embraced by the terms of the act. The acting commissioner, it is said, must "have charge of the public works, where such crossing is proposed;" and that where there are no public works, his approval can not be given. "Having charge of the public works, where such crossing is proposed," means nothing more than that such place shall be within the territorial jurisdiction of the commissioner. Any other construction would involve this absurdity: However a navigable river might be improved by the public works, yet if there were not public works at the place of crossing, the commissioner can not act. The legislature can not be charged with acting so unwisely. By the law of 1852, a new system was introduced, suited to the enterprise of the age, and it was intended to cover the whole ground of ordinary legislation on the subject. The words "navigable waters," were used in no restricted sense; they embrace. and were intended to embrace, all waters within the state, which are navigable by the works of art or nature. The plan of the bridge over the Sandusky Bay having been approved by Steadman, the acting commissioner. and the place of crossing being within his jurisdiction, it is not doubted, that under the "Port Clinton Charter." a bridge may be constructed as proposed. if it cause no obstruction to commerce.

Whether we look into the ordinance of 1787, the Acts of congress of the 13th July, 1787, of the 7th of August. 1789, of the 7th of May, 1796, or the constitution, which declares that congress shall have power to regulate commerce among the several states, we find the power to protect the commercial interests of the Union. But, as was observed by the court in the Wheeling Bridge Case, the exercise of this great public right is not incompatible with the enjoyment of local rights. The public right consists in an unobstructed use of every navigable water, connecting two or more states; the local right, in crossing such water. The general commercial right is paramount to all state authority.

The question of obstruction remains to be considered. Numerous affidavits have been read, made by persons acquainted with the navigation of the Sandusky Bay, who think the bridge with the draws proposed, in a high wind and also in a dark night, would obstruct the navigation. When the wind is strong, it is said by some, that sail-vessels require the whole width of the bay to beat against the wind, and that at such times no sail-vessels could pass the draw. The draw proposed is 144 feet, to be opened and closed on a pivot in the center. It is admitted that steam vessels could pass the draw with less difficulty than vessels with sails. This class of witnesses suppose that all vessels not propelled by steam, in a strong wind could pass the draw only by the aid of ropes, working up by the side of the piers; and that this would cause considerable delay, and some expense. Other witnesses, of equal experience, differ from the above. They think vessels can pass the draw with little or no difficulty, and that in time of wind, not so high as to force them to anchor, they could pass by working round the piers with ropes, which would take up a very short space of time. And that in good weather the boats would sail through the draw without loss of time. Several witnesses speak of draws in bridges over arms of the sea, of less width than proposed, where vessels are constantly passing without complaint or delay. The witnesses from the sea-board, when added to those from the lake, are greater in number than those who think the bridge would obstruct the navigation of the bay.

Against the bridge it is urged that considerations of public advantage can not be weighed against any appreciable obstruction. That a public nuisance can not be tolerated, on the ground that the community may realize some advantages from its existence. Such is admitted to be the general principle on this subject; and yet there can scarcely be a draw in a bridge which does not. to some extent. delay vessels; but this is submitted to from public necessity. The draws in the bridges over Charles river. which is an arm of the sea, must be subject to the winds and waves, and also to the flowing of the tides; and yet through these draws more than ten times the number of vessels

pass daily that would pass through the draw in the proposed bridge. The unskillfulness of our navigators and seamen on the lakes is referred to, as an argument against the bridge. But men who undertake the navigation of vessels are presumed to have the necessary skill, and all regulations of commerce are founded on this hypothesis. Nor is an argument admissible, that proper attention would not be paid to the draws, by necessary lights, and hands to open them. All such regulations are founded on the supposition that proper attention will be paid, as less than that would expose the bridge to damage. The commerce of the bay above the bridge, including the Sandusky river, is not large; but it is of sufficient importance to bring it under the regulation of the commercial power of the Union, and to require its protection. In the Wheeling Bridge Case the court held, if a draw should be constructed in the bridge over the western channel, so as to admit of a safe and an unobstructed passage to steam-boats that could not pass under the eastern bridge, it would be considered as removing the nuisance complained of. To pass through a draw on a river, when its banks are full and its current rapid, is attended with much more difficulty and danger than where the draw is over a water agitated only or chiefly by the winds.

Nothing is more common than for witnesses, who are called as experts, to differ in opinion. And where this difference is so nearly on a balance as not to incline the scale on either side, however strong the testimony may be, when viewed on one side only, yet when both sides are considered, the parts neutralize each other, so as to produce no very decided effect on the mind. This is the character of the evidence in the case under consideration. In such a case the preventive and extraordinary remedy invoked ought not to be given. It is a remedy which may be ruinous to one of the parties, when the basis of the action is doubtful.

The prayer for an injunction is refused.